UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRON WORKERS' LOCAL NO. 25 PENSION
FUND; IRON WORKERS' LOCAL UNION
NO. 25, INDIVIDUAL ACCOUNT RETIREMENT
FUND; IRON WORKERS' HEALTH FUND OF
EASTERN MICHIGAN; IRON WORKERS' LOCAL
NO. 25 VACATION PAY FUND; and IRON WORKERS'
APPRENTICE FUND OF EASTERN MICHIGAN,

        Plaintiffs,

v.                                                                           Case No. 04-73114
                                                                            Honorable Patrick J. Duggan

FUTURE FENCE COMPANY,
KENNETH J. HOLLOWELL, and
JOANN HOLLOWELL,

        Defendants.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 24,2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Plaintiffs, various fringe benefit trust funds ("Funds"), brought this action pursuant

to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended 29

U.S.C. §§ 1001-1461, seeking unpaid fringe benefit contributions allegedly owed by

Defendants for the period beginning in mid-August 1998 through the present.[1]  According to the Funds, the contributions are owed pursuant to collective bargaining agreements between Defendant Future Fence Company ("Future Fence") and Local Union No. 25 of the International Association of Bridge, Structural, and Ornamental Iron Works, AFL-CIO ("Union").  The Funds seek to hold Defendant Kenneth Hollowell, the principal of Future Fence, personally liable for the unpaid contributions as an ERISA fiduciary.  The Funds agreed to dismiss Defendant Joann Hollowell, Mr. Hollowell's spouse, without prejudice, and this Court issued a stipulated order to that effect on November 3, 2005.  Presently before the Court is the Funds' motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, filed May 12, 2006.[2]  The Court held a hearing on the Funds' motion on July 20, 2005.

---

[1]The Funds' auditor identified amounts owing from January 1997 through June 2002; however, the Funds acknowledge that they are barred by the relevant statute of limitations from seeking contributions more than six years before August 18, 2004– the date they filed this lawsuit.  In order to establish Defendants' liability from June 2002 forward, the Funds seek an order requiring Future Fence to submit to an additional audit.

[2]The Funds previously filed a motion for summary judgment, which was heard by the Court on September 29, 2005.  At the hearing, the Court inquired as to whether Future Fence might be able to locate documentation setting forth the types of projects its employees performed.  The Court therefore delayed ruling on the Funds' motion to allow Future Fence time to search its records.  Subsequent to the hearing, Future Fence produced additional documents and the parties engaged in settlement negotiations.  At that time, the Funds withdrew their initial summary judgment motion.  When the parties were unable to reach an agreement, the Funds filed their pending motion for summary judgment.

2

I.      **Factual Background**

In 1979, Mr. Hollowell started Future Fence as its sole owner in Warren, Michigan.  In 1990, Mr. Hollowell incorporated Future Fence and became its President. Future Fence manufactures fences at its Warren, Michigan facility and installs fencing at residential and commercial locations.  The company currently employs approximately 55 individuals.  *See* Defs.' Resp. Ex. 1 ¶ 3.  Approximately 20 employees install fencing, about 20 employees manufacture fencing, and the remaining employees are involved in sales and office administration.  *See id.*

Prior to 1988, Future Fence did not have a relationship with any union.  In 1988, Future Fence began working on a job at Joe Louis Arena in Detroit, Michigan.  *See* Defs.' Resp. Ex. 1 [Hollowell Aff.] ¶ 5.  At the time, this was the largest job Future Fence had ever secured.  *See id.*  During the project, the Union's representative Gregory Hicks approached Mr. Hollowell and threatened to shut down the project if Future Fence did not enter into an agreement with the Union.  *See id.*  Mr. Hicks presented Mr. Hollowell with the 1987-1989 Collective Bargaining Agreement ("CBA" or "agreement") between the "Fence Contractors Association"[3] and the Union.  *See id.* ¶ 7.

Mr. Hicks and Mr. Hollowell then engaged in discussions concerning the CBA,

_____

[3]According to Defendants, although the 1987-1989 CBA and 1989-1992 CBA state that the agreements are between the Union and either the "Fence Contractors Association" or the "Fence Erectors Association," *see* Defs.' Resp. Ex. 1, Tab 1 at 1, in fact no such associations existed and therefore no negotiations occurred between those associations and the Union.  *See* Defs.' Resp. Ex. 1 ¶ 14.

3

specifically its "Craft Jurisdiction" clause– i.e. the clause setting forth the work "covered" by the agreement. *See* Defs.' Resp. Ex. 1 ¶¶ 6-7.  According to Mr. Hollowell, he was particularly concerned about the work covered by the CBA because, on one hand, he needed to enter the agreement to avoid losing the Joe Louis job, but on the other hand, he believed that if the agreement required Future Fence to pay union scale, including fringe benefits, on all its work, the company would be put out of business. *See id*. ¶ 6.  Mr. Hollowell claims that during these discussions, Mr. Hicks advised him that the Craft Jurisdiction described in Article II of the CBA meant work covered by either a "Project Labor Agreement," a "National Maintenance Agreement," or a "General President's Agreement."[4]  *See id*. ¶ 8.

Mr. Hollowell thereafter signed the CBA on December 1, 1988.  Although he never signed subsequent collective bargaining agreements, the 1987-1989 CBA contained an automatic renewal provision binding Future Fence to the terms of subsequent agreements unless it provided the Union written notice at least thirty days prior to the expiration of the agreement.  *See* Defs.' Resp. Ex. 1, Tab A at 17, Art. XX ¶ 2.

---

[4]Mr. Hollowell states that Mr. Hicks described these agreements as follows.  A Project Labor Agreement ("PLA") is an *ad hoc* assertion of jurisdiction by the Union over a specific project.  *See id*. ¶ 9.  A National Maintenance Agreement ("NMA") involves a national contract between certain major corporations, such as General Motors Corporation or Ford Motor Company and the Union requiring all construction work undertaken at their facilities to be done by union labor.  *See id*. ¶ 10. Finally, a General President's Agreement ("GPA") is an agreement between the Union and, for instance, a builder who would commit with the Union that every building put up by that builder would be "union work," i.e. covered by the CBA.  *See id*. ¶ 11.

4

Defendants do not claim that Future Fence ever sent written notice to the Union terminating the agreement.  Mr. Hollowell acknowledges receiving subsequent CBAs covering the periods 1989-1992, 1998-2001, and 2001-2004.[5]  *See* Defs.' Resp. Ex. 1 ¶ 14.

After the execution of the 1987-1989 CBA until sometime in 1998, Future Fence did not employ any Iron Workers who were "card-carrying" members of the Union.  *See* Defs.' Resp. Ex. 1 ¶ 16.  Any work Future Fence performed under a PLA, NMA, or GPA job instead was done pursuant to "temporary cards" issued by the Union to Future Fence employees.  *See id.*  Defendants claim that Future Fence made all appropriate fringe benefit payments pursuant to the CBA for the hours its employees worked on these jobs. *See id*.

Beginning in 1998, after discussions with Mr. Hicks, Mr. Hollowell agreed to employ approximately six card-carrying Union members.  *See* Defs.' Resp. Ex. 1 ¶ 17. According to Mr. Hollowell, it was understood between himself and Mr. Hicks that the work of these employees would be covered by the CBA only when the employees were working on a PLA, NMA, or GPA project.  *See id.*  According to Mr. Hollowell, fringe benefit payments for covered work would be made pursuant to notice received from the

_____

[5]Mr. Hollowell never signed these subsequent agreements and he claims he never had any discussions with the Union regarding these agreements, with the exception of discussions about an agreement applicable to the 2004-2007 time-frame.  *See* Defs.' Resp. Ex. 1 ¶ 14.  Mr. Hollowell also claims that he never received copies of the CBAs covering the periods 1992-1995 and 1995-1998.  *See id*.

Funds or its agents that the work was covered under a PLA, NMA, or GPA. *See id.* ¶ 19. Beginning in 2002, Future Fence began paying fringe benefits in connection with all work performed by two Union members, regardless of whether their work was covered work. *See id.* ¶¶ 18-19.

Sometime in 2003 or thereafter, the Funds initiated an audit of Future Fence covering the period from January 1997 through June 2002.[6] The auditor, Robert Reeves, identified three categories of employees from Future Fence's records: (A) all individuals on the company's payroll for whom fringe benefit contributions were not made; (B) all individuals on the company's payroll who were designated as fence installers and/or who had pension histories with the Union at one time or another for whom fringe benefit contributions were not made; and (C) all individuals on the company's payroll who were members of the Union for whom fringe benefit contributions were not made. *See* Pls.' Mot. Ex. C. For those three categories of employees, Mr. Reeves concluded that Future Fence owed the following in outstanding fringe benefit contributions: (A) $6,261,743.87; (B) $3,544,411.64; and (C) $1,362,091.14.

---

[6]Audits of Future Fence previously were initiated in August 1994, April 1996, and February 2000. *See* Defs.' Resp. Ex. 1 ¶ 21. In his affidavit, Mr. Hollowell claims that at the conclusion of those audits, the auditors effectively told him that "everything's fine." *See id.* The Funds' auditor, Mr. Reeves, however, provides that the previous audits were "tabled" because Future Fence's records lacked sufficient information to complete the audit. *See* Pls.' Mot. Ex. M at 14-16.

## II.    Parties' Arguments

There is no dispute that Future Fence was required to make fringe benefit contributions to each of the Funds for employees performing covered fence work.[7]  The parties disagree, however, as to what work was covered under the CBAs.  The Funds argue that the language of the CBAs' Craft Jurisdiction provisions unambiguously required Future Fence to make contributions for the installation of "chain link fence" and "all fence on construction sites."  Relying on Mr. Hicks' alleged representations to Mr. Hollowell when the latter agreed to enter into the 1987-1989 CBA, Defendants maintain that the CBAs only required Future Fence to make contributions for work performed on jobs under a PLA, NMA, or GPA.  Defendants contend that Future Fence has made such contributions.

The Funds also argue, however, that they are entitled to summary judgment regardless of how the Court interprets the CBAs' Craft Jurisdiction provisions due to Future Fence's failure to maintain records in compliance with ERISA.  As the Funds' auditor, Mr. Reeves, explains, Future Fence's payroll records provide the number of hours employees worked but do not identify the type of projects on which employees worked or the number of hours employees worked on particular projects.  *See* Pls.' Mot.

---

[7]In their motion and reply briefs, the Funds spend some time presenting facts to demonstrate that Future Fence is obligated to make contributions pursuant to the CBAs, even though Mr. Hollowell only signed the 1998-1989 CBA.  In response to the Funds' motion for summary judgment, however,  Future Fence does not argue that it is not bound by subsequent CBAs.

7

Ex. D ¶ 6; Ex. W ¶¶ 4-9.  Therefore, Mr. Reeves maintains and the Funds argue that,

regardless of whether covered work is defined as the installation of chain link fence and

all fence on construction sites or only the installation of fence on PLA, NMA, and GPA

projects, Mr. Reeves cannot determine the number of hours Future Fence employees

engaged in covered work.  *See id*. Ex. W.  Relying on the Sixth Circuit's decision in

*Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (1994),

the Funds argue that Future Fence's failure to keep records showing the amount of

covered work its employees performed results in the company owing benefits for all

hours worked by employees who performed any covered work during the relevant time

period (i.e. 1998-2002).

In addition to arguing that there is an ambiguity in the CBAs' Craft Jurisdiction

provisions precluding summary judgment in the Funds' favor, however, Defendants also

argue that the Funds' motion for summary judgment should be denied because the 1987-

1989 CBA is *void ab initio*.  As Defendants argue, if the agreement is interpreted in the

manner asserted by the Funds, it is broader than Mr. Hicks represented to Mr. Hollowell.

Defendants therefore maintain that Mr. Hicks misrepresented a material term of the

agreement to induce Mr. Hollowell's signature.  Defendants also raise laches as a defense,

arguing that the CBAs required the Funds to immediately provide written notice to Future

Fence if they deemed Future Fence to have violated its duties to pay contributions under

the agreements.  Because the Funds failed to object to Future Fence's interpretation of the

CBA's Craft Jurisdiction clauses for twelve years, Defendants claim the Funds expressly

8

waived the issue and are barred by the doctrine of laches from seeking additional contributions according to a broader interpretation of those provisions.

As to Mr. Hollowell, the Funds argue that he is personally liable as a fiduciary for any unpaid contributions.[8]  In response, Defendants argue that the Funds' claim against Mr. Hollowell is barred by the three year statute of limitations set forth in 29 U.S.C. § 1113.  Defendants further argue that Mr. Hollowell does not qualify as a "fiduciary" under ERISA.

## III.   Standard for Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[8]Previously, relying on *Laborers Pension Trust Fund v. Sydney Weinberger Homes, Inc.*, 872 F.2d 702, 706 (6th Cir. 1988), the Funds sought to hold Mr. Hollowell personally liable for the unpaid contributions pursuant to a piercing the corporate veil theory.  The Funds do not make this argument in their pending motion for summary judgment and therefore the Court will assume that they have abandoned this theory of liability.

9

322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255.

## IV.    Applicable Law and Analysis

Pursuant to ERISA, an employer is obligated to make contributions to multiemployer plans according to the terms and conditions of the CBAs to which the employer is a signatory.  29 U.S.C. § 1145.  Trustees of the funds to which the employer is obligated to make contributions are authorized to enforce this requirement as fiduciaries.  *See* 29 U.S.C. § 1132(a)(3).

### A.    What Work is "Covered" Under the CBAs

The 1987-1989 CBA contains the following language regarding jurisdiction:

> It is agreed that the jurisdiction of work covered by this agreement is the erection of chain link fence, all fence on construction sites, all fence on bridges or overpasses. Highway guard rail, sound barriers within right of way highway and parking lot.  All pre-cast or concrete barriers on

10

> highways and/or parking lots.  Bin-type retaining walls of
> similar type installations.  Erection, setting, repairing, lining
> and anchoring of guard or collision rails on approaches.

*See* Pls.' Mot. Ex. F Art. II.  Beginning in 1992, insofar as it related to fence work, the

collective bargaining agreements' jurisdiction of work clause stated: "chain link fence, all

fence on construction sites."  As indicated previously, the Funds argue that these terms

are unambiguous and that Future Fence was bound to pay contributions pursuant to the

written language of the agreements.  Defendants argue that extrinsic evidence–

specifically indications that "residential" fence work is not considered covered work and

the alleged oral understanding between Mr. Hollowell and the Union representative, Mr.

Hicks– demonstrates an ambiguity with regard to these terms.  The Court agrees with the

Funds that, regardless of any side understanding between Future Fence and the Union, the

Funds are entitled to seek contributions pursuant to the CBAs' express terms.

> Section 515 of ERISA provides:

> > Every employer who is obligated to make contributions to a
> > multiemployer plan under the terms of the plan or under the
> > terms of a collectively bargained agreement shall, to the
> > extent not inconsistent with law, make such contributions in
> > accordance with the terms and conditions of such plan or such
> > agreement.

29 U.S.C. § 1145.  The Sixth Circuit has explained Congress' intent in enacting this

section as follows:

> > Congress enacted section 515 in order to permit
> > multiemployer plans to 'rely upon the terms of collective
> > bargaining agreements and plans *as written*, thus 'permitting
> > trustees of plans to recover delinquent contributions

> efficaciously, and without regard to issues which might arise
> under labor-management relations law . . .'" *Central Penn.*
> *Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85
> F.3d 1098, 1103 (3d Cir. 1996)(quoting 126 Cong. Rec.
> 23,039 (1980)(remarks by Rep. Thompson)).

*Bakery & Confectionery Union and Indus. Int'l Health Benefits and Pension Funds v.*

*New Bakery Co.*, 133 F.3d 955, 959 (6th Cir. 1998)(emphasis added).  Thus courts,

including the Sixth Circuit, conclude that "multiemployer plans are entitled to rely on the

literal terms of written commitments between the plan, the employer, and the union," and

that "the actual intent of and understandings between the contracting parties are

immaterial." *Id.* (citing *Bakery and Confectionery Union and Indus. Int'l Pension Fund*

*v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) and *Central States,*

*Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148,

1149 (7th Cir. 1989)(en banc)).  As the Sixth Circuit has explained further, a fund "thus

stands much like a holder in due course in commercial law who is entitled to enforce the

writing 'without regard to understandings or defenses applicable to the original parties.'"

*Id.* (quoting *McCormick Dray Line*, 85 F.3d at 1103)(internal quotation marks omitted).

Relying on *NILEC International Marketing Group v. Ameritech Services, Inc.*[9] and

*International Union, United Mine Workers of America v. Apogee Coal Co.*[10], Defendants

argue that extrinsic evidence can be considered to demonstrate an ambiguity in contract

---

[9] 362 F.3d 354 (6th Cir. 2004).

[10] 330 F.3d 740 (6th Cir. 2003).

12

terms that otherwise appear unambiguous.  These cases, however, are not applicable in the present context.  Neither case involved an action by trustees of an ERISA fund seeking to enforce the terms of a collective bargaining agreement.  In *Ameritech Services*, a general partnership brought a breach of contract claim against a company providing telecommunication services.  362 F.3d at 355.  *Apogee Coal* involved a union's claim that the defendant coal company violated a successorship provision contained in a series of collective bargaining agreements.  330 F.3d at 741.  As the previous discussion makes clear, the rules for interpreting a contract in an action brought by a multiemployer plan against an employer to enforce the terms of a collective bargaining agreement are not the same as the rules in an action brought against the same employer by the union which entered into the agreement or in an action involving other types of contract disputes.

Accordingly, in this action brought by the Funds– as opposed to the Union itself– the Court must interpret Future Fence's obligations to make fringe benefit contributions according to the plain language of the CBAs, without regard to any alleged oral understanding reached between Mr. Hollowell and Mr. Hicks.

13

**B.    Whether Defendants Can Avoid Liability Based on the Union's Alleged Representations Regarding the Scope of Work Covered by the 1987-1989 CBA**

Defendants argue that the 1987-1989 CBA is *void ab initio* because Mr. Hicks

misrepresented the scope of the work covered under the agreement in order to induce Mr.

Hollowell's execution of the agreement.  Whether Mr. Hicks' alleged representations

relieve Defendants of liability depends on whether they demonstrate "fraud in the

execution" of the agreement, as opposed to "fraud in [its] inducement."  Only the former

is a viable defense in trust fund collection actions.[11]  *See, Iron Workers' Local 25 Pension*

*Fund v. Allied Fence and Sec. Sys., Inc.*, 922 F. Supp. 1250 (E.D. Mich. 1996); *see also*,

*Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683, 688-

92 (E.D. Mich. 1997)(discussing difference between two defenses and summarizing cases

involving defenses); *Trustees for the Upper Peninsula Plumbers' and Pipefitters' Health*

---

[11]As Judge Rosen indicated in *Allied Fence*, courts generally construe Section 515 of ERISA, 29 U.S.C. § 1145, as sharply limiting the defenses available to employers in actions seeking payment of delinquent contributions to three basic defenses:

> "(1) that the pension contributions themselves are illegal; (2) that the collective bargaining agreement is *void ab initio*, as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement; and (3) the employees have voted to decertify the union as their bargaining representative, thus prospectively voiding the union's collective bargaining agreement."

922 F. Supp. at 1256 (quoting *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992)); *see also Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683, 688 n.10 (E.D. Mich. 1997).

14

& *Welfare Fund v. Frazer*, – F. Supp. 2d – , 2006 WL 1008992, at *5 (W.D. Mich. 2006)(recognizing that only fraud in the execution is a defense and distinguishing it from fraud in the inducement).

The Ninth Circuit has explained the difference between "fraud in the inducement" and "fraud in the execution" as follows:

> The former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is. . . . "Fraud in the execution" arises when a party executes an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." Uniform Commercial Code § 3-305(2)(c).

*Southwest Adm'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986), *cert. denied*, 479 U.S. 1065, 107 S. Ct. 951 (1987)(internal citations omitted). In the case before the Ninth Circuit, "the misrepresentation concerned whether the express provisions of the agreement would in fact be enforced," which the court held was "an example of fraud in the inducement." *Id*. at 774-75. In comparison, courts have found "fraud in the execution" where a union representative presents an employer with the signature page of a cba, but not the agreement itself, and represents the terms of the cba as providing or not providing something which is expressly contradicted by the actual terms of the agreement. *See, e.g., Connors v. Fawn Mining Corp.*, 30 F.3d 483 (3d Cir. 1994)(finding fraud in the execution where the employer signed the signature page of a cba, without being presented with the agreement and having been informed by the union representative

15

that the agreement did not contain a provision requiring contributions to a particular fund, when in fact provision was in the agreement); *Operating Eng'rs Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984)(ruling that an employer was not obligated to make benefit contributions under a collective bargaining agreement because he signed forms based solely upon the representation of the union's business agent that the forms were part of the standard application for union membership, when instead they constituted a short-form collective bargaining agreement); *Iron Workers' Local No. 25 Pension Fund v. Klassic Serv., Inc.*, 913 F. Supp. 541 (E.D. Mich. 1996)(finding fraud in the execution when employer was presented only with the signature page of a cba and was told by the union's representative that the agreement only covered work to be performed at a specific location for a limited period of time). Defendants contend that *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683 (E.D. Mich. 1997)– a case in which the court found fraud in the execution of agreements– is instructive in this case. This Court disagrees, finding material differences between the two cases.

In *Nyeholt Steel*, the company was approached by a union representative who threatened to shut down the employer's job site if it did not hire union work for the project. 976 F. Supp. at 685. The union representative then presented the company with a document to sign in which the company agreed to be bound by the terms of a cba. *Id.* at 685-86. The union representative represented the cba as a "one-job agreement" and wrote the name of the job at the top of the document signed by the employer. *Id.* The cba, which notably was not provided to the company, in fact contained no durational

16

limitation. *Id*. at 690.  The employer signed a second, identical document with respect to a different project. *Id*. at 686.  Judge Gadola concluded that the company established fraud in the execution of both agreements, finding that "it is uncontroverted that Koby, the union representative, made representations which induced Nyeholt to assent to a contract entirely different from the proposed contract." *Id*. at 690.

Therefore, unlike Future Fence, the employer in Nyeholt "was totally incognizant of the fact that the CBA contained no provision effectuating the durational limitation to which Nyeholt and Koby agreed, and, in fact, contained a provision obligating Nyeholt Steel to make fringe benefit contributions for all jurisdictional work henceforth performed by Nyeholt Steel employees." *Id*.  As Judge Gadola noted, Nyeholt was never given a copy of the underlying cba and thus was unaware that it was assenting to an agreement different than that described by the union representative.  Future Fence, in comparison, does not claim that Mr. Hughes failed to provide Mr. Hollowell with a copy of the CBA before he signed it or that Mr. Hughes misrepresented the actual terms of the CBA. Instead, Defendants assert only that Mr. Hughes represented that the Union would not enforce the terms of the CBA as written. Thus Mr. Hollowell did not execute the 1987-1989 CBA "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms."  *See Rozay's Transfer, supra*.

The Court therefore concludes that Defendants establish a defense of fraud in the inducement, not fraud in the execution.  As indicated previously, fraud in the inducement is not a viable defense in this claim for benefits brought by the Funds.

17

C.    Whether the Funds Can Avoid Liability Based on Laches

Defendants argue that because Future Fence, since 1988, has paid contributions in accordance with its current interpretation of the CBAs' Craft Jurisdiction provisions, and because neither the Funds nor the Union ever complained about that practice until the Funds filed suit in 2004, the Funds' lawsuit is barred by laches.  It is not clear whether the Sixth Circuit would recognize laches as an available defense in an action brought against an employer by the trustees of fringe benefit funds seeking to collect unpaid contributions.  As noted previously, the Sixth Circuit has indicated that only three basic defenses are available to employers in this context.  *See supra* at n.10.  The cases Defendants cite in their response brief do not hold otherwise.  *See* Defs.' Resp. at 20.  Nevertheless, even if the defense is available, the Court does not believe that Defendants establish the necessary elements to invoke its protection.

"Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party."  *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).  The party invoking laches bears the burden of proving these two elements.  *See Bylinski v. City of Allen Park*, 169 F.3d 1001, 1003 (6th Cir. 1999).  Defendants fail to meet their burden.

First, it is not clear whether Defendants can establish that the Funds unreasonably delayed pursuing any unpaid contributions from Future Fence.  Defendants assert that the Funds were aware of Future Fence's narrow interpretation of the work covered by the

18

CBAs in 1996, relying on hand-written notes on an envelope presumably made by the auditor in charge of the 1996 audit, Steve Stefansky.  *See* Defs.' Resp. at 20 (citing Ex. 9); Pls.' Mot. Ex. M at 14.  Defendants, however, do not present Mr. Stefansky's testimony to explain these notes.  The Court questions the admissibility of this evidence based on the apparent absence of any testimony to authenticate the document and based on the hearsay rules.  *See* FED. R. EVID. 801 & 901; *see also Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006)(providing that once the moving party establishes its burden, "the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established *by admissible evidence* which demonstrate a genuine issue for trial.")  Moreover, even if the Funds were aware in 1996 of the manner in which Future Fence was interpreting the CBAs' Craft Jurisdiction provisions, this does not necessarily mean that the Funds also were aware at the time that additional contributions were due.  In fact the Funds tabled the first three audits of Future Fence because the auditors were not able to determine from the company's records the amount of contributions owed.

In any event, Defendants fail to indicate how Future Fence was prejudiced by any delay.  It appears to the Court that the only impact on Future Fence as a result of the Funds' delay is that the company avoided paying contributions based on the written terms of the CBAs earlier.  *See Brown-Graves*, 206 F.3d at 684 (rejecting employer's laches defense, finding that "the only 'step' Brown-Graves could have taken [if it had been notified of the fund's claim sooner] would have been to make the contributions.")

      **D.**     **Whether Mr. Hollowell is Liable for the Unpaid Contributions as a**

**Fiduciary**

With respect to whether Mr. Hollowell can be held personally liable as a fiduciary, Defendants maintain that the Funds' action is barred by ERISA's statute of limitations for such claims. Defendants also argue that Mr. Hollowell was not acting as a fiduciary with respect to contributions owed prior to 2002. Because the Court concludes that Mr. Hollowell was not a fiduciary during the relevant period, it will not address Defendants' statute of limitations argument.

ERISA provides that a person is a fiduciary with respect to a plan when he or she *inter alia* "exercises any discretionary authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). ERISA does not define when funds become "plan assets." *See, e.g., In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005); *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003). The cases on which the Funds rely, however, indicate that "the question of when an employer's contribution becomes an 'asset' of a plan must be determined by reference to the rights and obligations created by the underlying wage agreement." *See* Pls.' Mot. at 23 (quoting *United States v. Panepinto*, 818 F. Supp. 48, 51 (E.D.N.Y. 1993); *see also Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc.*, 352 F. Supp. 2d 794, 804 (E.D. Mich. 2004)(recognizing that "[t]he Sixth Circuit has yet to consider when unpaid benefit contributions become plan assets" and therefore following the Third Circuit's holding that "benefit contributions become plan assets at the moment they are due, so long as the parties have agreed that contributions become plan assets when due.")

20

Relying on the definition of "Contributions" and "Plan Assets" set forth in a pension trust document dated January 1, 2002, the Funds contend that all due and owing contributions became vested plan assets on the date on which they were due. *See* Pls.' Mot. at 9 (citing Ex. R). One problem with the Funds' argument is that they currently are seeking to hold Mr. Hollowell liable for unpaid contributions for a period beginning in 2001.[12] As Defendants demonstrate, previous trust agreements lack a definition of plan assets and only define plan contributions as payments "made" to the trust by the employer. *See* Defs.' Resp. Ex. 1 Tab D, at § 2.5.

Moreover, courts have held that "[a] person should not be attributed fiduciary status under ERISA and held accountable for performance of the strict responsibilities required of him in that role, if he is not clearly aware of his status as a fiduciary." *Hall*, 334 F.3d at 1015 (citing *Herman v. Nationsbank Trust Co. (Georgia)*, 126 F.3d 1354, 1366 (11th Cir. 1997)). In this case, while Mr. Hollowell signed the 1987-1989 CBA on behalf of Future Fence, he never agreed to be personally liable for the company's fringe benefit contributions. More importantly, Mr. Hollowell attests that he neither received nor had any knowledge of the Funds' trust agreements prior to this litigation. *See* Defs.' Resp. Ex. 1 ¶ 28. Thus the evidence indicates that Mr. Hollowell never was made aware of his personal duties as a fiduciary.

For the above reasons, the Court concludes that Mr. Hollowell is not liable for the

_____

[12]Notably, the Court has not been provided with the section of the 2002 trust agreement indicating when that agreement became effective. *See* Pls.' Mot. Ex. R.

21

unpaid fringe benefit contributions as a fiduciary.

### E.   How to Calculate Defendants' Liability for Unpaid Contributions Due to Future Fence's Failure to Maintain Adequate Records

ERISA requires employers to ". . . maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees . . ." 29 U.S.C. § 1059(a). According to the Funds' auditor, Mr. Reeves, Future Fence failed to maintain adequate records. As Mr. Reeves states:

> Future Fence did not and does not keep adequate project and job records in order for an appropriate payroll audit to be completed. In other words, the payroll records simply indicate the amount of hours certain individuals were paid but not what type of jobs or projects they performed labor on.

*See* Pls.' Mot. Ex. D ¶ 6. Pursuant to the Sixth Circuit's holding in *Grimaldi Concrete*, under these circumstances, Future Fence is liable to the Funds for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed by its employees. 30 F.3d at 697.

In *Grimaldi Concrete*, various multiemployer trust funds sued Grimaldi Concrete to recover unpaid fringe benefit contributions pursuant to a series of collective bargaining agreements. The funds' auditor had not been able to determine the amount of work for which contributions were due under the CBAs because the employer's records failed to specify the hours spent performing covered work. *Grimaldi*, 30 F.3d at 694-95. The district court concluded that the employer therefore violated Section 1059 and, as a result, the employer's records were inadequate to support a calculation of benefits owed under

22

the collective bargaining agreement. *Id*. The court concluded that "'the penalty must fall upon the person who had the legal responsibility to maintain those records'" and therefore the employer was liable for contributions for all hours worked. *Id*. at 695.

The Sixth Circuit agreed and affirmed the district court's judgment. In doing so, the Sixth Circuit elected to follow "the sensible approach" set forth by the Ninth and Eleventh Circuits "that an employer's failure to maintain adequate records shifts the burden to the employer to prove that the work performed was covered or not covered." *Id*. at 695-96 (citing *Operating Eng'rs Pension Trusts v. B & E Backhoe*, 911 F.2d 1347, 1354 (9th Cir. 1990); *Brick Masons Pension Trust v. Indus. Fence and Supply*, 839 F.2d 1333, 1337-39 (9th Cir. 1988); *Combs v. King*, 764 F.2d 818, 826 (11th Cir. 1985)). The employer's records in *Grimaldi Concrete* failed to set forth the number of hours the corporation's employees worked on specific projects and failed to specify the projects on which each laborer worked. *Id*. at 696.

The appropriate remedy, the Sixth Circuit held, is to hold the employer liable "for all contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed." *Id*. at 697. As the court reasoned, "an 'employer cannot be heard to complain that the damages lack the precision of measurement that would be possible had he kept records in accordance' with the Act." *Id*. (quoting *Anderson v Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S. Ct. 1187, 1192-93 (1946)). Stated differently, "'[a]n employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind

23

his failure to keep records as statutorily required.'" *Id.* (quoting *Brick Masons*, 839 F.2d at 1338).

*Grimaldi Concrete* therefore instructs that Future Fence is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed. At this time, however, the Court is not prepared to decide what that amount should be. First, the numbers the Funds have provided to the Court thus far include periods for which the Funds are not seeking contributions. More importantly, up to this point in the litigation, Defendants have focused on their argument that Future Fence is not obligated to pay contributions according to the Funds' interpretation of the CBAs. Because Defendants disputed what work was covered by the CBAs, the Court is not convinced that they even attempted to satisfy their burden under *Grimaldi Concrete* of proving that certain hours should not have been included in Mr. Reaves' audit. Now that this Court has decided what work is covered under the CBAs, it believes Future Fence should have an opportunity to focus on the amount of its liability to the Funds.

## V.    Conclusion

For the reasons set forth above, the Court finds that the Funds are entitled to fringe benefit contributions pursuant to the express terms of the CBAs, regardless of any side agreement or understanding between Future Fence and the Union. The Court further concludes that Future Fence has not established any defense to its liability. Mr. Hollowell, however, is not liable for the unpaid contributions as a fiduciary. The extent of Future Fence's liability will be decided after the Funds conduct an audit for the period

24

from June 2002 forward and once Future Fence has the opportunity to prove that work

included in the audits was not covered work, as defined by this Court.

Accordingly,

**IT IS ORDERED**, that Plaintiffs' Motion for Summary Judgment is **GRANTED**

**IN PART AND DENIED IN PART**.

                                    s/PATRICK J. DUGGAN
                                    UNITED STATES DISTRICT JUDGE

Copies to:
Michael Asher, Esq.
David Selwocki, Esq.
Thomas Kienbaum, Esq.
Jay Boger, Esq.